OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, AFL–CIO, and James K. Phillips, Jr., Vice President of Oil, Chemical and Atomic Workers International Union, AFL–CIO, Appellees,

v.

DEPARTMENT OF ENERGY, Appellant.

No. 01–5163.

United States Court of Appeals, District of Columbia Circuit.

Argued March 7, 2002.

Decided May 10, 2002.

Douglas Hallward–Driemeier, Attorney, U.S. Department of Justice, argued the cause for appellant. With him on the

briefs were Roscoe C. Howard, Jr., U.S. Attorney, and Leonard Schaitman, Attorney, U.S. Department of Justice.

Daniel Guttman argued the cause for appellees. With him on the brief were Brian P. McCafferty, Reuben A. Guttman and Traci L. Buschner.

Before: RANDOLPH and ROGERS, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Dissenting opinion filed by Circuit Judge ROGERS.

RANDOLPH, Circuit Judge:

This is an appeal of an award of attorney's fees for actions brought under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Government in the Sunshine Act, 5 U.S.C. § 552b. The question is whether *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), decided while this appeal was pending, applies to FOIA cases.

## I.

Congress created the United States Enrichment Corporation ("USEC") to operate uranium enrichment plants in the country. *See* 42 U.S.C. § 2297a (1992). There are two such facilities, one in Kentucky, the other in Ohio. The Oil, Chemical, and Atomic Workers International Union represented employees at both plants. In 1996, Congress decided to "privatize" USEC by having a private entity lease the facilities. *See* USEC Privatization Act, Pub.L. No. 104–134, 110 Stat. 1321–335 (1996) (codified at 42 U.S.C. § 2297h). Concerned that privatization would affect its members' employment, the union

sought information about what was planned. USEC refused to provide the information voluntarily. The union then sent a FOIA request to USEC. On June 30, 1998, after USEC failed to provide the information, the union filed this action in the district court. A few weeks later the union brought a separate suit under the Government in the Sunshine Act, 5 U.S.C. § 552b, seeking to open USEC's board meetings on privatization to the public. The district court denied the union's request for a temporary restraining order that would have required an "open" board meeting. Privatization occurred a few weeks later, on July 28, 1998.

In August 1998, the government moved to dismiss the FOIA and Sunshine Act suits, arguing that the court's jurisdiction ended when USEC ceased to be a public entity. Rather than grant the motion, the district court substituted the Department of Energy as defendant on the grounds that the Privatization Act called for the government to fulfill obligations incurred by USEC, and that there was a "Record Agreement" to the same effect. Several status hearings took place after this order. On December 10, 1999, the parties (the union and the Energy Department) filed a Stipulation and Order of Dismissal stating that the government had provided "substantial amounts of material" and dismissing the claims with prejudice, although reserving the union's right to seek attorney's fees. The district court endorsed the stipulation.

The parties were unable to resolve the attorney's fees issue amongst themselves, so the union filed an application for fees with the district court on April 17, 2000. On March 16, 2001, the court ruled that the union was entitled to receive fees, but not in the full amount it sought. (The court stated that the union could recover any Sunshine Act fees in its motion for

fees under FOIA, but it also denied the union's request for fees related to its failed attempt to get injunctive relief halting the USEC board meeting or opening it to the public. The union does not appeal this decision, so our analysis is limited to the request for fees under FOIA.) After the court's order, the parties stipulated that the proper amount of fees and costs totaled $108,173.25, reserving the Energy Department's right to appeal. The court ordered the payment of this amount on March 30, 2001. Shortly after the government noted its appeal, the Supreme Court issued its opinion in *Buckhannon*, holding that attorney's fees are not authorized under the Fair Housing Amendments Act or Americans with Disabilities Act to a plaintiff who achieves the desired result without a judgment on the merits or a court-ordered consent decree. *See* 532 U.S. at 600–01, 121 S.Ct. at 1838.

## II.

In order to recover attorney's fees in a FOIA case, the plaintiff must have "substantially prevailed": the "court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E). In determining whether plaintiffs are eligible for an award, we have followed the "catalyst theory." So long as the "litigation substantially caused the requested records to be released," the FOIA plaintiff could recover attorney's fees even though the district court had not rendered a judgment in the plaintiff's favor. *Chesapeake Bay Found., Inc. v. Dep't of Agric.*, 11 F.3d 211, 216 (D.C.Cir. 1993) (citing *Vermont Low Income Advocacy Council, Inc. v. Usery*, 546 F.2d 509, 513 (2d Cir.1976)); *see also Cuneo v. Rumsfeld*, 553 F.2d 1360, 1364 (D.C.Cir. 1977).

In *Buckhannon*, the Supreme Court rejected the "catalyst theory." Plaintiffs there had alleged that certain "self-preservation" provisions of a state fire code violated the Fair Housing Amendments and Americans with Disabilities Acts as applied to an assisted-living facility. *See* 532 U.S. at 600, 121 S.Ct. at 1838. Before the district court ruled, the state legislature repealed the provisions. *See id.* at 601, 121 S.Ct. at 1838. Plaintiffs then moved for attorney's fees, arguing that under the fee-shifting statutes at issue they were "prevailing parties" because their lawsuit had prompted the change in the law. *See id.* The Supreme Court held that absent some sort of judicial *imprimatur*, a plaintiff could not be considered a "prevailing party" and an award of attorney's fees was therefore impermissible.

■ The Energy Department argues that *Buckhannon*'s rejection of the catalyst theory applies also to FOIA, a possibility we have already noticed. *See Students Against Genocide v. Dep't of State*, 257 F.3d 828, 841 n. 14 (D.C.Cir.2001). As the Court pointed out in *Buckhannon*, 532 U.S. at 602–03, 121 S.Ct. at 1838–40, there are dozens of fee-shifting statutes, some worded slightly differently from others. A wide range of statutes uses the "substantially prevails" formulation. *See, e.g.,* 5 U.S.C. § 552a(g)(2)(B) (Privacy Act); 5 U.S.C. § 552b(i) (Government in the Sunshine Act); 15 U.S.C. § 26 (Clayton Act); 16 U.S.C. § 470w–4 (National Historic Preservation Act); 28 U.S.C. § 2465(b)(1) (return of forfeited or condemned property); 42 U.S.C. § 300aa–31(c) (National Vaccine Injury Compensation Program). Many other statutes use "prevailing party." As to a litigant's eligibility for an award of attorney's fees, we have treated these statutes as substantially similar. *See, e.g., Pub. Citizen Health Research*

*Group v. Young,* 909 F.2d 546, 549 (D.C.Cir.1990) (Equal Access to Justice Act) ("It is enough that the lawsuit was a 'causal, necessary, or substantial factor in obtaining the result' plaintiff sought."); *Comm'rs Court of Medina County, Tex. v. United States,* 683 F.2d 435, 442 (D.C.Cir. 1982) (Voting Rights Act). *Buckhannon* expressly endorsed this approach. After citing to a long list of such statutes, a list including FOIA, the Court stated that it had "interpreted these fee-shifting statutes consistently," 532 U.S. at 603 & n. 4, 121 S.Ct. at 1839 & n. 4 (citing *Marek v. Chesny,* 473 U.S. 1, 43–51, 105 S.Ct. 3012, 3034–38, 87 L.Ed.2d 1 (1985) (Appendix to opinion of Brennan, J., dissenting); *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983)). Five circuits have applied *Buckhannon* to other fee-shifting statutes. *See, e.g., Smyth v. Rivero,* 282 F.3d 268, 274–76 (4th Cir.2002) (42 U.S.C. § 1988); *Perez-Arellano v. Smith,* 279 F.3d 791, 794 (9th Cir.2002) (Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A)); *J.C. v. Reg'l Sch. Dist. 10,* 278 F.3d 119, 124 (2d Cir.2002) (Individuals with Disabilities in Education Act, 20 U.S.C. § 1415(i)(3)(B)); *N.Y. State Fed'n of Taxi Drivers, Inc. v. Westchester County Taxi & Limousine Comm'n,* 272 F.3d 154, 158 (2d Cir.2001) (42 U.S.C. § 1988); *Chambers v. Ohio Dep't of Human Servs.,* 273 F.3d 690, 693 & n. 1 (6th Cir.2001) (42 U.S.C. § 1983); *Crabill v. Trans Union, L.L.C.,* 259 F.3d 662, 667 (7th Cir.2001) (Fair Credit Reporting Act, 15 U.S.C. §§ 1681n, 1681o); *cf. Bennett v. Yoshina,* 259 F.3d 1097, 1100 (9th Cir. 2001) ("There can be no doubt that the Court's analysis in *Buckhannon* applies to statutes other than the two at issue in that case.").

We therefore adhere to the proposition, well-established in this court and in the Supreme Court, that eligibility for an award of attorney's fees in a FOIA case should be treated the same as eligibility determinations made under other fee-shifting statutes unless there is some good reason for doing otherwise. One such reason, the union argues, is the contrast between the language of the statutes in *Buckhannon,* which authorized fees for the "prevailing party," *see* 42 U.S.C. §§ 3613(c)(2) & 12205, and FOIA, which allows fees if "the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E). It is true, as the union points out, that *Buckhannon* treated "prevailing party" as a "legal term of art." 532 U.S. at 603, 121 S.Ct. at 1839. Yet all must agree that a "prevailing party" and a "party who prevails" are synonymous. FOIA's addition of the modifier "substantially" might possibly be taken as limiting the category of "prevailing parties," but it cannot be taken as expanding the universe of parties eligible for a fee award. To put this in concrete terms, a FOIA plaintiff may seek thousands of documents but wind up with a judgment providing only a handful of insignificant documents. One might say this plaintiff was a prevailing party, but nevertheless not say that the plaintiff substantially prevailed. *Cf. Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 789–92, 109 S.Ct. 1486, 1492–94, 103 L.Ed.2d 866 (1989) (discussing "significance" as it pertains to the definition of "prevailing party"). We have seen nothing to suggest that Congress sought to draw any fine distinction between "prevailing party" and "substantially prevail." The Internal Revenue Code, for instance, defines "prevailing party" to mean a party who has "substantially prevailed." 26 U.S.C. § 7430(c)(4)(A). Consistent with our practice (and the Supreme Court's) of viewing the various fee-shifting statutes as interchangeable, we have in the past treated the "substantially prevail" language in FOIA as the functional equiva-

lent of the "prevailing party" language found in other statutes. *See Foster v. Boorstin*, 561 F.2d 340, 342 (D.C.Cir.1977).

The union also maintains that since FOIA cases are equitable in nature, the limitations imposed in *Buckhannon* are not appropriate. Judge Friendly made the argument forcefully in an influential opinion:

> To take an extreme example, Congress clearly did not mean that where an FOIA suit had gone to trial and developments made it apparent that the judge was about to rule for the plaintiff, the Government could abort any award of attorney fees by an eleventh hour tender of the information requested.

*Vermont Low Income Advocacy Council*, 546 F.2d at 513. But FOIA cases are not unique in this respect. There are many potential actions in which the "prevailing party" may sue for injunctive relief or for damages and an injunction. *See, e.g., Wagshal v. Foster*, 28 F.3d 1249, 1251 (D.C.Cir.1994) (plaintiff seeking damages and injunctive relief under 42 U.S.C. § 1983). It is hard to believe that Congress would have intended to create a system in which a "prevailing party" would be eligible to recover fees for the injunction portion of the lawsuit but not for the damages portion. The Supreme Court in *Buckhannon* considered a problem similar to that posed by Judge Friendly but refused to limit its holding to actions at law. 532 U.S. at 608–10, 121 S.Ct. at 1842–43. In the Court's view, policy arguments could not carry the day because the meaning of "prevailing party" was clear. *See id.* at 610, 121 S.Ct. at 1843.

The union also sees a distinction between FOIA cases and *Buckhannon* stemming from FOIA's legislative history. The argument is that Congress intended FOIA's attorney's fee provision to be understood differently from comparable provisions in other statutes such as the Americans with Disabilities Act. The history leading to passage of FOIA is thoroughly surveyed in Judge Friendly's opinion in *Vermont Low Income Advocacy Council. See* 546 F.2d at 512–13. The original House bill made a plaintiff's eligibility for an award of fees turn on whether the court had issued an injunction against the government. *See id.* at 512. The final House bill conditioned eligibility on the government's not prevailing. *See id.* The Senate bill contained the "substantially prevailed" language, along with a list of factors for the court to consider in determining whether to make an award. *See id.* The accompanying Senate report talked about eligibility for attorney's fees in cases in which the plaintiffs had successfully proven that the government had wrongfully withheld information. *See id.* at 512. The final version, as it emerged from conference, deleted the Senate's list of factors. *See id.* at 513. With great respect to Judge Friendly, on whose opinion we relied in *Cuneo*, 553 F.2d at 1364 & nn.3–8, this record is inconclusive. None of the Committee reports mentions awarding fees in the absence of a judgment. And both the House and the Senate reports contain statements suggesting that the FOIA provision was modeled after fee-shifting provisions allowing fees for a "prevailing party," which further supports treating FOIA no differently than the statutes interpreted in *Buckhannon. See* H.R.Rep. No. 93–876 (1974), *reprinted in* Legislative History of the Freedom of Information Act, 1974 Amendments 126–27 & n.10 (1975); S.Rep. No. 93–854 (1974), *reprinted in* Legislative History, *supra*, at 170, U.S.Code Cong. & Admin.News 1974, 6267.

We therefore hold that in order for plaintiffs in FOIA actions to become eligible for an award of attorney's fees, they

must have "been awarded some relief by [a] court," either in a judgment on the merits or in a court-ordered consent decree. *Buckhannon,* 532 U.S. at 603, 121 S.Ct. at 1839. Because *Buckhannon* controls, the existing law of our circuit must give way. *See Benavides v. Bureau of Prisons,* 993 F.2d 257, 258–59 (D.C.Cir. 1993) (reversing circuit precedent on the eligibility of a *pro se* FOIA plaintiff for attorney's fees in light of *Kay v. Ehrler,* 499 U.S. 432, 438, 111 S.Ct. 1435, 1438, 113 L.Ed.2d 486 (1991), a case arising under 42 U.S.C. § 1988).

### III.

■ The union claims that even if *Buckhannon* applies, we should sustain the award because the parties received a "court-ordered settlement." The Department of Energy became a defendant on March 18, 1999. The parties agreed to dismiss the case on December 10, 1999. In the interim, the district court had issued three orders. The first, entered on March 31, 1999, ordered the government to review the documents the union sought and to submit a "joint report with a proposed schedule" no later than July 10, 1999. The parties timely filed the joint report, stating that the Energy Department had reviewed the 4,000 documents and that "to the greatest extent possible, the parties wish to resolve this case without further contested proceedings." The court's second order directed the parties to submit another "status report" by August 20, 1999. The parties' second report stipulated that, "[s]ubject to the approval of the Court," the government had provided most of the materials the union had requested, that it would search for the remaining items and release any that did not merit withholding under FOIA's exemptions, and that the union was dismissing its case with prejudice except for the remaining items. The parties reiterated that they "wish[ed]

to resolve this case to the greatest extent possible without further contested proceedings" and asked for leave of the court to continue negotiations until December 8, 1999. The court signed the document, which carried the heading "Stipulation and Order." It is clear from the record that to this point the court had not rendered any judgment about the legality of the government's withholding any information and that the parties had been attempting to resolve the case through negotiation. *See, e.g.,* 3/31/99 Tr. at 9:19–23 ("I'll certainly read the joint report as soon as it comes in, and ... I'll either sign off on what you've given me or set up a conference call or an in-court status to resolve things finally.").

On December 10, 1999, the court approved the parties' final status report as a "Stipulation and Order" stating in its entirety:

Subject to the approval of the Court, it is hereby stipulated and agreed as follows by and between the undersigned:

1. In light of defendant's production of substantial amounts of material responsive to plaintiff's claim for relief in this action, the action is hereby dismissed with prejudice and, except as provided in ¶ 2, without fees or costs.

2. The dismissal of this action shall be without prejudice to the right of plaintiff to obtain in [this case], an award of attorney's fees and litigation costs covering work performed in this action.

This order did not constitute a decision on the merits; the court had no contested issues before it. The "Stipulation and Order" approved the parties' terms of dismissal, but this was merely a formality. An "action may be dismissed ... without order of the court ... by filing a stipulation of dismissal signed by" all of the parties. *See* FED.R.CIV.P. 41(a)(1).

The union claims that since the court signed the order, it is a "court-ordered consent decree[ ]." *Buckhannon*, 532 U.S. at 604, 121 S.Ct. at 1840. By this term, the Supreme Court meant "a court 'ordered chang[e] [in] the legal relationship between [the plaintiff] and the defendant.'" *Id.* (quoting *Tex. State Teachers Ass'n*, 489 U.S. at 792, 109 S.Ct. at 1493–94); *see also Smyth*, 282 F.3d at 278–82 & n. 11 (discussing the meaning of a "consent decree" in the *Buckhannon* context). The Court distinguished private settlements, which do not create a " 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." *Buckhannon*, 532 U.S. at 604 & n. 7, 121 S.Ct. at 1840 n. 7 (quoting *Tex. State Teachers Ass'n*, 489 U.S. at 792–93, 109 S.Ct. at 1493). The discussion in *Buckhannon* also makes clear that there must be some sort of "judicial relief" in favor of the party seeking an award of fees. *See* 532 U.S. at 606, 607 n. 9, 121 S.Ct. at 1841, 1842 n. 9; *id.* at 622, 121 S.Ct. at 1849–50 (Scalia, J., concurring).

The December 10 Stipulation and Order of Dismissal did not meaningfully alter the legal relationship of the parties. Its only effect was to dismiss the union's lawsuit with a court order when no court order was needed. That cannot represent "judicial relief" for the union. Aside from the union's attorney fee request, there was nothing left for the district court to oversee. This contrasts with the consent decree in *Maher v. Gagne*, 448 U.S. 122, 126, 100 S.Ct. 2570, 2573, 65 L.Ed.2d 653 (1980), which increased AFDC allowances and gave recipients the right to prove that their individual expenses exceeded the standard levels. The decree in *Maher* constituted "judicial relief" that "materially altered" the rights of the parties: for example, it estopped the government from refusing to disburse benefits in excess of the standard level to an individual who demonstrated the requisite personal expense level. Had the December 10 stipulation between the union and the Energy Department outlined documents the government still needed to disclose to the union, matters might be different. But the parties stipulated that the union had received enough information to forego continuation of its lawsuit.

■ Our dissenting colleague thinks that the district court's endorsement of the August 23, 1999, stipulation qualifies as a "settlement agreement enforced through a consent decree." *Buckhannon*, 532 U.S. at 604, 121 S.Ct. at 1840. The union's brief never made this argument. It argued instead that the court's denial of the Energy Department's motion to dismiss changed the legal relationship of the parties. Neither the union's argument, nor the dissent's attempt to salvage the union's case, are correct. Surviving a motion to dismiss does not alter the legal relationship between parties. *See Hanrahan v. Hampton*, 446 U.S. 754, 758, 100 S.Ct. 1987, 1989–90, 64 L.Ed.2d 670 (1980). The dissent's focus on the August 23, 1999, stipulation ignores the interim nature of that order, which is properly viewed as a procedural ruling that cannot serve as the basis for a determination that the union prevailed. *See id.* at 759, 100 S.Ct. at 1990. The only part of the order which arguably changed the legal status of the parties was the requirement that the Energy Department complete its record review in 60 days. Before August 23, the court had not ordered the Energy Department to turn over any documents; after August 23, the Energy Department still had no obligation to do so. Both before and after August 23 the district court did not disallow any of the Energy Department's justifications for exempting documents, or portions of documents, from disclosure. This is not judicial relief on the

*merits* of the union's complaint. *Contrast Maher*, 448 U.S. at 126, 100 S.Ct. at 2573 (settlement agreement required government to pay higher AFDC benefits to plaintiffs). The dissent theorizes that the August order prompted the Department to turn over enough information so that by December the parties could agree to dismiss the case. In other words, filing the lawsuit and receiving some scheduling orders served as a catalyst resulting in the relief the union sought. Even if the dissent's assessment had any proof behind it (it seems equally plausible that the Energy Department simply lacked the time to review the items), *Buckhannon* clearly instructs that we are not to analyze "the defendant's subjective motivations in changing its conduct." 532 U.S. at 609, 121 S.Ct. at 1843. Instead, we are to look for some form of "judicial relief," and it is clear that the union received none.

Under the rule of *Buckhannon*, the union therefore was not entitled to attorney's fees because it did not "substantially prevail."

*Reversed.*

ROGERS, Circuit Judge, dissenting:

Today the court decides whether the Supreme Court's decision in *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), applies to suits for attorney's fees under the Freedom of Information Act ("FOIA"). *See* Opinion at 453. Even assuming that the answer to this question is in the affirmative, there are two separate problems with the court's opinion. The first involves the suggestion that the Supreme Court's decision in *Buckhannon* bars attorney's fees in the absence of a final judgment on the merits or a consent decree embodying a settlement. To reach this interpretation of

*Buckhannon*, the court, contrary to the other circuits, glosses over the holding and underlying rationale of *Buckhannon*. The second problem arises from the court's failure to acknowledge the plain terms of the district court's order to the government to turn over documents that Oil, Chemical and Atomic Workers International Union ("OCAW") sought under FOIA and that the government had previously withheld.

I.

The holding and rationale of the Supreme Court in *Buckhannon* is hardly as broad as some of the court's language today suggests. The Supreme Court stated its holding as follows: "[W]e hold that the 'catalyst theory' is not a permissible basis for the award of attorney's fees under the [Fair Housing Amendments Act of 1988], 42 U.S.C. § 3613(c)(2), and [the Americans with Disabilities Act of 1990], 42 U.S.C. § 12205." *Buckhannon*, 532 U.S. at 610, 121 S.Ct. at 1843. The reasons that the Court gave were as follows. The Court first noted that the term "prevailing party" is a legal term of art that means "one who has been awarded some relief by the court." *Id.* at 603, 121 S.Ct. at 1839. The Court then explained that its precedent was consistent with this meaning. Reviewing its previous decisions addressing the meaning of "prevailing party," the court explained that in addition to a judgment on the merits by the court, *see id.* at 603–04, 121 S.Ct. at 1839–40 (citing *Hanrahan v. Hampton*, 446 U.S. 754, 758, 100 S.Ct. 1987, 1989–90, 64 L.Ed.2d 670 (1980) (per curiam); *Hewitt v. Helms*, 482 U.S. 755, 760, 107 S.Ct. 2672, 2675–76, 96 L.Ed.2d 654 (1987); and *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)), settlement agreements enforced through a court-ordered consent decree may also serve as the basis for an

award of attorney's fees. *Id.* at 604, 121 S.Ct. at 1840 (citing *Maher v. Gagne,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980)). Although consent decrees need not contain a defendant's admission of liability, the Court viewed them as a court-ordered " 'chang[e] [in] the legal relationship between [the plaintiff] and the defendant.' " *Id.* (quoting *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792, 109 S.Ct. 1486, 1493–94, 103 L.Ed.2d 866 (1989)) (alterations in the original). The Court also distinguished consent decrees from private settlements, noting that "[p]rivate settlements do not entail the judicial approval and oversight involved in consent decrees[, a]nd federal jurisdiction to enforce a private contractual settlement will often be lacking unless the terms of the agreement are incorporated into the order of dismissal." *Id.* at 604 n. 7, 121 S.Ct. at 1840 n. 7 (citing *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994)).

Finding a common thread in its precedent, the Court in effect established a line: a party prevails only upon obtaining a "judicially sanctioned change in the legal relationship of the parties." *Id.* at 605, 121 S.Ct. at 1840. On one side of the line, the Court observed that its precedent reveals that "enforceable judgments on the merits and court-ordered consent decrees create the 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." *Id.* at 604, 121 S.Ct. at 1840 (quoting *Tex. State Teachers Ass'n,* 489 U.S. at 792–93, 109 S.Ct. at 1493–94). The Court then held that the " 'catalyst theory' falls on the other side of the line from these examples" because "[i]t allows an award where there is no judicially sanctioned change in the legal relationship of the parties." *Id.* at 605, 121 S.Ct. at 1840. The Court explained that "[a] defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." *Id.*

The Supreme Court's holding and rationale in *Buckhannon* do not limit attorney's fees awards to cases in which there is either a final judgment on the merits or a consent decree. Rather than define these two forms of relief as the only instances in which there could be a "prevailing party" for purposes of recovering attorney's fees, the Court used these forms of relief as discrete examples, illustrated by its precedent, in which the need for "judicial *imprimatur* on the change" in the parties' legal relationship is present. *Id.* As the factual setting before the Supreme Court makes clear, the Court did not have the occasion to provide an exhaustive list of the various forms of judicial relief that the plaintiff must obtain in order to be a "prevailing party" for purposes of an award of attorney's fees. In *Buckhannon,* the petitioner's suit for declaratory and injunctive relief coincided with the State legislature's subsequent repeal of the allegedly offending statute, and the district court thereafter dismissed the lawsuit as moot. *Id.* at 601, 121 S.Ct. at 1838. There was no judicial involvement in the resolution of the litigation. Petitioners, however, sought attorney's fees as prevailing parties under the FHAA and the ADA on the theory that the lawsuit had served as a catalyst of the repeal. *Id.* Not having any occasion to consider the precise contours of the necessary judicial imprimatur on the change in the legal relationship of the parties, the Supreme Court did not need to, and in fact did not, seize the opportunity to explain more than that the "catalyst theory" as applied on the facts before the Court — where there was no judicial involvement in the resolution — was not enough.

Indeed, the Supreme Court's review of its precedents demonstrates that the Court did not establish a finite list of the forms of judicial relief that are necessary to "prevail." Rather, as described by the Court, on one side of the line, where there is a "prevailing party" for purposes of recovering attorney's fees, is precedent holding that judgments on the merits and consent decrees are sufficient to give rise to prevailing party status. *See id.* at 605–06, 121 S.Ct. at 1840–41 (discussing *Farrar,* 506 U.S. at 112, 113 S.Ct. at 573–74; and *Maher,* 448 U.S. at 129–30, 100 S.Ct. at 2574–75). On the other side of the line, the Court, again looking to its precedent, indicated only that preliminary victories such as withstanding a motion for a directed verdict or a motion for summary judgment for failure to state a cause of action were insufficient. *Id.* at 605–06, 121 S.Ct. at 1840–41 (citing *Hewitt,* 482 U.S. at 760, 107 S.Ct. at 2675–76; and *Hanrahan,* 446 U.S. at 759, 100 S.Ct. at 1990). Although the Court in *Buckhannon* only specifically listed a judgment on the merits or a court-ordered consent decree as examples on the other side of the prevailing party line, *id.* at 606, 121 S.Ct. at 1841 (citing *Farrar,* 506 U.S. at 112, 113 S.Ct. at 573–74; and *Maher,* 448 U.S. at 129–30, 100 S.Ct. at 2574–75), attorney's fees could be awarded in other circumstances. For example, two members of the majority noted that court-approved settlements in addition to consent decrees bore the necessary judicial imprimatur. *Id.* at 618, 121 S.Ct. at 1847–48 (Scalia, J., concurring, joined by Thomas, J.). Additionally, in *Hanrahan,* cited with approval in *Buckhannon,* the Court acknowledged that "[t]he legislative history of the Civil Rights Attorney's Fees Awards Act of 1976 [§ 1988] indicates that a person may in some circumstances be a 'prevailing party' without having obtained a favorable 'final judgment following a full trial on the merits.'" *Hanrahan,* 446 U.S.

at 756–57, 100 S.Ct. at 1989 (quoting H.R.Rep. No. 94–1558, at 7 (1976)). The House Committee Report indicated that Congress had adopted the approach that the Court had taken in *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), in which the Court stated that "'the entry of any order that determines substantial rights of the parties may be an appropriate occasion upon which to consider the propriety of an award of counsel fees....'" *Hanrahan,* 446 U.S. at 757, 100 S.Ct. at 1989 (quoting H.R.Rep. No. 94–1558, at 8 (quoting *Bradley,* 416 U.S. at 723 n. 28, 94 S.Ct. at 2022 n. 28)). The Senate Committee Report stated that "the award of counsel fees *pendente lite* would be 'especially appropriate where a party has prevailed on an important matter in the course of litigation, even when he ultimately does not prevail on *all* issues.'" *Id.* (quoting S.Rep. No. 94–1011, at 5 (1976)). From this history, the Court concluded:

> It seems apparent from these passages that Congress intended to permit the interim award of counsel fees only when a party has prevailed on the merits of at least some of his claims. For only in that event has there been a determination of the "substantial rights of the parties," which Congress determined was a necessary foundation for departing from the usual rule in this country that each party is to bear the expense of his own attorney.

*Id.* at 757–58, 100 S.Ct. at 1989. Nothing in *Buckhannon* suggests that the Court has overruled this precedent; rather, the Court only clarified that the catalyst theory fell on the other side of the line of this precedent.

The circuits that have addressed *Buckhannon* have not read it to be as broad a bar to attorney's fees as the court suggests today. Several circuits have confronted a

pure catalyst theory claim and naturally read *Buckhannon* to bar such awards of attorney's fees, notwithstanding the fee provision at issue. *See, e.g., Perez-Arellano v. Smith,* 279 F.3d 791, 795 (9th Cir. 2002) (Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A)); *Chambers v. Ohio Dep't of Human Servs.,* 273 F.3d 690, 693 (6th Cir.2001) (Civil Rights Act, 42 U.S.C. § 1988). However, when confronted with a private settlement, the Ninth Circuit in *Barrios v. California Interscholastic Federation,* 277 F.3d 1128 (9th Cir.2002) (Americans with Disabilities Act of 1990, 42 U.S.C. § 12205), upheld the award in light of circuit precedent and limited *Buckhannon's* holding to the rejection of the catalyst theory, describing as mere dictum the Supreme Court's rejection of private settlements as sufficient to provide prevailing party status. *Id.* at 1134 n. 5. *See also Johnson v. District of Columbia,* 190 F.Supp.2d 34, 45 & n. 3 (D.D.C.2002) (Individuals with Disabilities Education Act, 20 U.S.C. § 1415(i)(3)(B)). *But see Perez–Arellano,* 279 F.3d at 793–94 (Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A)).

Other circuits, taking a less narrow reading of *Buckhannon* than the Ninth Circuit, have nonetheless recognized that *Buckhannon* has a limited holding in two respects. First, the circuits have looked at the particular attorney's fees statute at issue to determine whether *Buckhannon's* interpretation of "prevailing party" applies. For example, the Tenth Circuit in *Center for Biological Diversity v. Norton,* 262 F.3d 1077 (10th Cir.2001), declined to apply *Buckhannon* to the attorney's fees provision of the Endangered Species Act, 16 U.S.C. § 1540(g)(4), which did not require that there be a "prevailing party" and left the decision to award fees to the discretion of the district court. *Id.* at 1080 n. 2. Other circuits considering other statutes have also treated this as a threshold

question in applying *Buckhannon's* reasoning. In *Crabill v. Trans Union, L.L.C.,* 259 F.3d 662 (7th Cir.2001), for example, the Seventh Circuit concluded upon examining the text, structure, and legislative history of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681o & 1681n, that the reasoning of *Buckhannon* applied. *Id.* at 666–67. The Federal Court of Claims, in *Brickwood Contractors, Inc. v. United States,* 49 Fed. Cl. 738 (2001), on the other hand, limited *Buckhannon* to the statutes cited by the Court and declined to apply *Buckhannon* to the Equal Access to Justice Act. *Id.* at 744–47.

Second, the circuits have looked beyond whether the relief obtained was either a judgment on the merits or a consent decree and instead have looked for action compelled by the court, focusing on the underlying concern of the Supreme Court in *Buckhannon* that there be some "judicial *imprimatur* on the change" in the parties' legal status. As the Seventh Circuit explained in *Crabill* in rejecting a claim of entitlement to attorney's fees in the absence of any judicially ordered relief, "[t]he significance of the *Buckhannon* decision ... [is] its insistence that a plaintiff must obtain formal judicial relief, and not merely 'success,' in order to be deemed a prevailing or successful party under any attorneys' fee provision comparable to the civil rights attorneys' fee statute." *Crabill,* 259 F.3d at 666. Thus, the Second Circuit in *J.C. v. Regional School District 10, Board of Education,* 278 F.3d 119 (2d Cir.2002), in addressing fee awards under the Individuals with Disabilities Education Act, 20 U.S.C. § 1415(i)(3)(B), and the Rehabilitation Act of 1973, 29 U.S.C. § 794a(b), considered whether the relief received by the plaintiff was more akin to a judicial consent decree or a private settlement, and concluded that statutorily required relief could not be a substitute for a

judicial order or decree under *Buckhannon*. *Id.* at 125. Likewise, the Fourth Circuit in *Smyth v. Rivero*, 282 F.3d 268 (4th Cir.2002), applying § 1988, considered whether the two forms of relief obtained by the plaintiff constituted sufficient judicial relief to trigger prevailing party status in *Buckhannon* by examining on which side of the *Buckhannon* line the relief fell. *Id.* at 274–75. Concluding that the preliminary injunction plaintiffs obtained was more akin to the judicial relief deemed inadequate in *Buckhannon* because it was a "preliminary, incomplete ... merits examination," *id.* at 277, the Fourth Circuit examined whether an agreement between the parties that was referenced in the district court's final order of dismissal was sufficient to show entitlement to attorney's fees. *Id.* at 273–74, 284. Observing that *Buckhannon* indicated that "a determination of 'legal merit' is necessary for an award of attorney's fees," *id.* at 281 (quoting *Buckhannon*, 532 U.S. at 605, 121 S.Ct. at 1840), and that the Supreme Court's focus was on "judicial approval and oversight involved in consent decrees," *id.* at 281–82 (quoting *Buckhannon*, 532 U.S. at 604 n. 7, 121 S.Ct. at 1840 n. 7) (internal quotation marks omitted), the Fourth Circuit declined to read *Buckhannon* "so restrictively as to require that the words 'consent decree' be used explicitly," and instead concluded that an order containing an agreement of the parties may be the functional equivalent of a consent decree for purposes of the *Buckhannon* inquiry. *Id.* at 281. The court concluded that the district court's order of dismissal was insufficient, however, because the order did not entail a judicially enforced obligation to comply with the terms of the agreement: it neither stated that the court retained jurisdiction to enforce the parties' agreement nor compelled compliance with the terms agreed to by the parties. *Id.* at 284. Rather, the court concluded, the

findings in the final order were "most properly read as noting and reciting the agreement ... as a component of its analysis of the mootness of the case...." *Id.* Similarly, in a case that is closest factually to the instant case, the First Circuit in *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9 (1st Cir. 2002), also applying § 1988, examined whether the appropriate judicial imprimatur on the relief was present. In *Kinton*, the answer turned on whether the district court had ordered the respondent to revise its regulations, the relief that the plaintiff sought in court. *Id.* at 30. Proceeding on the assumption that something other than a final judgment or consent decree sufficed for the judicial imprimatur required by *Buckhannon*, the First Circuit concluded upon review of the district court transcript that, although the district court had discussed the possibility of ordering the defendant to amend its regulations, "the [district] court eschewed an order and gave [the defendant] sixty days within which to decide what (if anything) it wished to do, reserving the possibility that the court might enter an order at a later date." *Id.* at 30. Under the circumstances, the First Circuit held that:

> The district court did not compel [the defendant] to adopt the regulations. Under the *Buckhannon* rule, that ends the matter. Because the district court entered no explicit order compelling, or even leading to, [the defendant's] adoption of the regulations, we cannot say that the district court's refusal to award attorneys' fees constituted an abuse of discretion.

*Id.* at 30.

The few district court opinions to have addressed *Buckhannon* likewise take the position that as long as a party has obtained some judicial relief more akin to a consent decree rather than a private set-

tlement, the *Buckhannon* test is satisfied. The district court in *Aynes v. Space Guard Products, Inc.*, 201 F.R.D. 445 (S.D.Ind. 2001), concluded that although an accepted offer of judgment under Federal Rule of Civil Procedure 68 was "neither a judgment on the merits nor a court-ordered consent decree," it satisfied the *Buckhannon* test because it was both "enforceable against [the] Defendant by this court unlike the resolution effected by a private settlement" and "caused a material alteration of the legal relationship of the parties." *Id.* at 450–51. Similarly, in *Johnny's IceHouse, Inc. v. Amateur Hockey Association of Illinois*, No. 00–7363, 2001 WL 893840 (N.D.Ill. Aug.7, 2001), the court refused to limit unduly the concept of court-ordered consent decrees and concluded that an order incorporating a settlement was sufficient under *Buckhannon*. *Id.* at *3. Likewise, in *National Coalition for Students with Disabilities v. Bush*, 173 F.Supp.2d 1272 (N.D.Fla.2001), the district court evaluated whether a settlement was the functional equivalent of a consent decree, constituting the necessary judicially-sanctioned change in the legal relationship between the parties to satisfy *Buckhannon*, *id.* at 1278–79, and concluded that it was because it was incorporated by reference into a court order in which the court retained jurisdiction to enforce its terms. *Id.*

The court today properly begins by addressing whether *Buckhannon*'s reasoning applies to attorney's fees suits under FOIA, but gives short shrift to *Buckhannon*'s reasoning and glosses over whether the relief obtained by OCAW was compelled by the district court. Although the court uses language that would suggest that *Buckhannon* is a bar to attorney's fees regardless of the nature of the judicial action short of a final judgment or a consent decree, *see* Opinion at 457, *Buckhannon* and the decisions interpreting it make clear that there is no principled basis for this suggestion. What is key under *Buckhannon* is whether the particular relief obtained results in a material change in the legal relationship of the parties that bears the necessary judicial imprimatur. The court's failure to come to grips with *Buckhannon*'s holding and rationale is only possible because of the second problem in the court's opinion.

## II.

*Buckhannon* indicates that to be a "prevailing party" one must obtain a change in the legal relationship of the parties that bears the necessary judicial imprimatur and cited as *examples* a judgment on the merits or a court-ordered consent decree. *Buckhannon*, 532 U.S. at 605, 121 S.Ct. at 1840–41; *see also id.* at 622, 121 S.Ct. at 1849–50 (Scalia, J., concurring). Because the question put to this court under *Buckhannon* is whether OCAW obtained a change in the legal relationship with the government that bears the necessary judicial imprimatur, the court's failure to address the district court's orders in the record with any particularity is inexplicable. OCAW, which is the appellee, pointed out during oral argument in response to the government's argument that the district court did not grant OCAW any of its requested relief, that the final resolution "did not emerge out of thin air" but resulted because on August 23, 1999 "the [district] court ordered ... the defendant ... [to] cause a search to be made ... and release to plaintiffs all records thus retrieved" and thus "the court was intimately involved in approving the settlement." An examination of the record makes clear that OCAW in fact obtained judicially sanctioned legal relief akin to a consent decree and hence sufficient to meet the *Buckhannon* test.

Overlooked almost in its entirety is the district court's August 23, 1999 Stipulation and Order. The court's recitation of the factual background ignores the August 23 Order. When the court finally refers to the August 23 Order it misrepresents and confuses its contents and mischaracterizes it as a "report." Opinion at 457. Contrary to the court's assertion, there is no indication in the August 23 Order that the government had provided "most of the materials" requested by OCAW. Opinion at 457. Although the August 23 Order resulted in the dismissal of OCAW's requests for some records, the order addressed other documents that the government refused to turn over to OCAW despite its FOIA request. In light of the plain terms of the August 23 Order, it cannot fairly be described as a "report." Rather, the court's characterization of the August 23 Order as the "parties' second report," Opinion at 457, reveals the court's confusion of this order with the parties' actual second report, dated November 8, 1999, which is titled "Second Joint Report." The August 23 Order, by contrast, is titled "Stipulation and Order" and consists of two parts: (1) the district court's identification of various documents that OCAW sought and that the government had refused to release; and (2) the district court's order to the government to search for and release those documents (subject to applicable FOIA exemptions) within 60 days. The district court signed the "Stipulation and Order" stating "Approved And So Ordered." As the parties themselves stated in their second report of November 8, 1999, "[b]y stipulation and order dated and filed August 23, 1999, the Court *directed* defendant to search for certain records and to release to plaintiffs 'all records thus retrieved except those records or portions of records determined to merit continued withholding under applicable law....'" Second Joint Report, Nov. 8, 1999 (quoting Stipulation & Order, Aug. 23, 1999, at ¶ 2) (emphasis added). The second report of November 8 also indicated that the government had complied with the terms of the August 23 Order.

The existence of the August 23 Order directing the government to release documents that OCAW had sought and the government had previously withheld is a judicially sanctioned victory on the merits; the release of withheld documents is the whole point of a FOIA lawsuit. *See* 5 U.S.C. § 552(a)(4)(B) (2000); *Students Against Genocide v. Dep't of State,* 257 F.3d 828, 841 (D.C.Cir.2001). The court recognizes as much when it notes that "[h]ad the December 10 stipulation between [OCAW] and the Energy Department outlined documents the government still needed to disclose to the union, matters might be different." Opinion at 458–459. But this is precisely what the August 23 Order provided. As a result of the August 23 Order, there is an undeniable change in the legal relationship of the parties: the district court ordered the government to release documents that it previously refused to produce upon OCAW's request. In addition, the relief obtained by OCAW in the August 23 Order bore the necessary judicial imprimatur: unlike a private settlement or resolution through negotiations by the parties, here, the district court's order recited the terms of the parties' negotiations and ultimate agreement so that the August 23 Order had elements of both "judicial approval and oversight involved in consent decrees." *Buckhannon,* 532 U.S. at 604 n. 7, 121 S.Ct. at 1840 n. 7. After the August 23 Order, the government was under an enforceable court-ordered legal obligation to release the identified documents, potentially facing a contempt citation for failure to comply. *See* 5 U.S.C. § 552(a)(4)(G). The August 23 Order is thus a material altera-

tion of the legal relationship of the parties bearing the necessary judicial imprimatur and hence satisfying *Buckhannon.* To reach a contrary conclusion the court is forced to rely on factual assertions that are unsupported by the record, to attack a theory that appears nowhere in this separate opinion, and to ignore both the "judicial relief" that OCAW in fact obtained and the arguments that OCAW in fact made on appeal.

For these reasons, I conclude that in light of the district court's August 23, 1999 Stipulation and Order directing the government to release documents previously withheld after being requested pursuant to FOIA, OCAW has satisfied the *Buckhannon* test because there has been a judicially sanctioned " 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." *Buckhannon*, 532 U.S. at 604, 121 S.Ct. at 1840 (quoting *Tex. State Teachers Ass'n*, 489 U.S. at 792–93, 109 S.Ct. at 1493–94). A remand is nonetheless required, for al-

though the district court ruled that the government withheld "numerous categories of documents ... without any legal basis for doing so," the record is unclear whether the district court would have reached the same decision considering only the documents OCAW obtained pursuant to the August 23 Order. On remand, the district court would determine OCAW's entitlement to attorney's fees, *see Chesapeake Bay Found., Inc. v. U.S. Dep't of Agric.*, 11 F.3d 211, 216 (D.C.Cir.1993), and if necessary, proportion the amount of attorney's fees previously awarded that are attributable to OCAW's efforts to obtain the documents that the government produced pursuant to the August 23, 1999 Order. Accordingly, I respectfully dissent.